IN THE UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF WISCONSIN

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

JAKEL MOTORS INCORPORATED,

                                     OPINION and ORDER
             Plaintiff,

                                        11-cv-306-bbc
      v.

AMERICAN ALTERNATIVE INSURANCE
CORPORATION,

             Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

Beginning in 2004, plaintiff Jakel Motors Incorporated was sued in a number of lawsuits relating to alleged damages caused by defects in motors manufactured by plaintiff and used in various ventilation and air conditioning systems. In response to the lawsuits, plaintiff tendered claims to various insurance companies from which it had purchased general liability insurance, including defendant American Alternative Insurance Corporation. Defendant agreed to defend plaintiff in the product liability lawsuits that fell under the general liability insurance policy it had sold to plaintiff and hired local counsel for the purpose. As the number of lawsuits mounted, plaintiff hired a law firm to act as national coordinating counsel for a number of the lawsuits. A year or so later, defendant refused to pay the fees for the law firm that plaintiff had hired.

In this suit, plaintiff contends that defendant breached its duty to defend and acted in bad faith by failing to pay the fees of the national counsel. Diversity jurisdiction exists

1

under 28 U.S.C. § 1332 because more than $75,000 is in controversy and plaintiff's citizenship (Wisconsin) is diverse from defendant's (Delaware and New Jersey).

The case is before the court on the parties' cross motions for summary judgment. Defendant contends that it is not obligated to reimburse plaintiff for the fees of national counsel because it did not consent to plaintiff's decision to hire national counsel and it had the right to control the defense. Dkt. #11. Plaintiff disagrees, arguing that the national counsel was a necessary part of the defense and that defendant's consent to the work counsel performed was implicit consent to the hiring. Dkt. #13. Defendant has moved for summary judgment on plaintiff's breach of contract and bad faith claims and plaintiff has moved for summary judgment solely on its contract claim.

I conclude that defendant breached its duty to defend by failing to reimburse plaintiff for the fees incurred by the national counsel. Although plaintiff did not obtain defendant's express consent before retaining national counsel, defendant's subsequent acceptance of national counsel's role in the defense and its cooperation with national counsel amounted to an implicit consent to national counsel's role in plaintiff's defense, for which it is obligated to pay for its work. Therefore, I will grant plaintiff's motion for summary judgment on its breach of contract claim and will deny defendant's motion on the same claim. However, I will grant defendant's motion with respect to plaintiff's bad faith claim. Under Missouri law, which governs in this case, claims relating to an insurer's duty to defend arise under contract law, not tort law.

From the parties' proposed findings of fact, I find the following facts to be material

and undisputed.

# UNDISPUTED FACTS

## A.  The Parties

Plaintiff Jakel Motors Incorporated manufactures and markets motors and blower systems for ventilation and air conditioning systems.  Until September 1, 2007, plaintiff's principal place of business was in Aurora, Missouri.  On September 1, 2007, plaintiff became a subsidiary of RBC Horizon, Inc, which is a subsidiary of Regal-Beloit Corporation.  Plaintiff is now a Wisconsin corporation with its principal place of business in Beloit, Wisconsin.

Defendant American Alternative Insurance Corporation is incorporated under the laws of the state of Delaware and has its principal place of business in New Jersey.

## B.  The Broan-NuTone Lawsuits

Broan-NuTone is a manufacturer of fans that are used in both residential and commercial applications.  Between 1976 and 2004, plaintiff manufactured electric motors that it sold to Broan-NuTone, which incorporated the motors into ventilation fans that were sold to consumers.

Beginning in approximately May 2004 and continuing to the present, numerous lawsuits have been brought against Broan-NuTone, alleging that defects in the fans caused fires.  Many of the Broan-NuTone fans contained motors manufactured by plaintiff.  The claims have been geographically dispersed throughout the United States.  They vary in

3

magnitude and span multiple years.  Generally, claimants have made claims against Broan-NuTone only, but a few claimants have made direct claims against plaintiff.  In many cases, Broan-NuTone has asserted claims against plaintiff.

### C.  Plaintiff's Insurance Policies

Plaintiff had three commercial general liability policies of insurance under which the Broan-NuTone claims fell.  Each of the policies required the insurers to provide a defense in addition to the payment of indemnity for "occurrences" falling within the policy period.

From October 1, 2003 to October 1, 2006, plaintiff was insured by Twin City Insurance Company.  Depending on the policy year, the Twin City policies have deductibles of either $5,000 or $25,000, which apply to defense and indemnity.  Of the Broan-NuTone claims, 82 losses occurred while the Twin City policies were in effect.

From October 1, 2006 to October 1, 2007, plaintiff was insured by defendant.  (I will refer to the policy of insurance issued by defendant as defendant's policy.)  Defendant's policy has a deductible of $25,000 for each claim, applying only to the payment of indemnity.  Plaintiff purchased the policy from defendant at a time when plaintiff's principal place of business was in Missouri.  The policy contains Missouri-specific endorsements.  Seventy of the Broan-NuTone claims fall under defendant's policy.

Since October 2007, after plaintiff was purchased by Regal-Beloit, plaintiff has been covered as an insured under Regal-Beloit's global policy issued by Travelers Insurance.  The Travelers policy has a $750,000 deductible for each occurrence and includes both defense and indemnity payments.  As of February 1, 2008, 25 losses had occurred under the

Travelers policy.  As of October 23, 2011, 243 losses had occurred under the Travelers policy.

### D.  Defendant's Policy

The policy plaintiff purchased from defendant provides that defendant

> [W]ill pay those sums that the insured becomes legally obligated to pay as damages because of "bodily injury" or "property damage" to which this insurance applies.  We will have the right and duty to defend the insured against any 'suit' seeking those damages.  However, we will have no duty to defend the insured against any 'suit' seeking damages for "bodily injury" or "property damage" to which this insurance does not apply.  We may, at our discretion, investigate any "occurrence" and settle any claim or "suit" that may result. . . . Our right and duty to defend ends when we have used up the applicable limit of insurance in the payment of judgments or settlements under Coverages A or B or medical expenses under Coverage C. . . . No other obligation or liability to pay sums or perform acts or services is covered unless explicitly provided for under supplementary payments—Coverages A and B.

Dkt. #12-2 at 1.

The "Supplementary Payments—Coverages A and B" provision provides that defendant "will pay, with respect to any claim we investigate or settle, or any 'suit' against an insured we defend. . . [a]ll expenses we incur [and] [a]ll reasonable expenses incurred by the insured at our request to assist us in the investigation or defense of the claim or 'suit,' including actual loss of earnings up to $250 a day because of time off from work."  Id. at 7-8.

The policy contains a cooperation provision, which provides that plaintiff must "[c]ooperate with us in the investigation or settlement of the claim or defense against the 'suit'; and . . . [a]ssist us, upon our request, in the enforcement of any right against any person or organization which may be liable to the insured because of injury or damage to

which this insurance may also apply." Id. at 10.  Finally, the policy states that "[n]o insured will, except at the insured's own cost, voluntarily make a payment, assume an obligation or incur any expense, other than for first aid, without our consent."  Id.

### E.  Initial Defense of the Broan-NuTone Claims

Each time a Broan-NuTone claim was made against plaintiff, plaintiff would determine which insurer provided coverage for the claim and would tender the claim to the appropriate insurer for a defense.  Defendant accepted coverage and agreed to defend without any reservation of rights claims involving property damage and bodily injury occurring between October 1, 2006 and October 1, 2007.  It hired third-party administrator Gallagher Bassett to handle the claims, giving Gallagher Bassett fixed authority to do certain things, including settling claims under a specified amount.  If issues arose outside its authority, Gallagher Bassett was required to ask for additional authority from David Matthiessen, defendant's claims specialist overseeing plaintiff's claims.

Plaintiff had no in-house counsel or any other individual suited to oversee multiple claims.  Until September 1, 2007, plaintiff's chief engineer, Tom Frisee, tendered the claims to Michael Rebuck, the claims administrator at Gallagher Bassett who had been assigned to handle the Broan-NuTone claims.  Rebuck had no legal training or training in coordinating multiple claims arising out of the same alleged product defect.  After plaintiff was acquired by Regal-Beloit's subsidiary, RBC Horizon, Inc., the responsibility for overseeing the Broan-NuTone claims fell to Charldene Schneier, one of three attorneys in Regal-Beloit's legal department.  Schneier contacted Rebuck to introduce herself, advise him of the change of

6

responsibilities and discuss the procedure for tendering claims.

For the first several Broan-NuTone claims that plaintiff submitted, Gallagher Bassett selected local counsel to represent plaintiff in the jurisdiction where the claim was made and the case was pending. If plaintiff was unhappy with the recommended counsel, plaintiff worked with Gallagher Bassett to retain its preferred counsel, subject to defendant's consent and approval. Gallagher Bassett would send the retained firm a hiring letter, requesting a litigation budget and setting forth reporting requirements. Some claims did not have counsel assigned because they were either dropped by the claimant or resolved.

After Schneier began overseeing the Broan-NuTone claims for plaintiff, she coordinated her activities with Gallagher Bassett through Rebuck with respect to retaining defense counsel. No formal process governed the appointment of defense counsel. Sometimes Rebuck would make the first contact with local counsel; on other occasions, Schneier would do so. Rebuck and Schneier would communicate through phone calls or emails regarding counsel and Rebuck would regularly approve Schneier's recommendations. Schneier would also talk to Mike Brian, the claim representative for Twin City Insurance, and Judy Wilder, the claim representative for Travelers Insurance, regarding defense counsel.

Schneier worked with engineers from Broan-NuTone to set up and prepare for inspections, which included collecting photos from prior inspections, fire department reports, police department reports and witness statements. She recommended engineering experts, drafted answers to discovery responses and, when necessary, provided defense counsel information needed to respond to discovery requests. At times, she selected experts that defendant would approve later.

As of September 2007, between five to 10 claims were pending under defendant's policy. Shortly after September 2007, the number of Broan-NuTone claims under defendant's policy increased, with several claims being brought in subsequent months, including a sizable claim involving a church fire in which damages were estimated at approximately $1 million and a claim involving a fire in an office building with multiple tenants that ultimately became the biggest claim under defendant's policy.

In early 2008, Broan NuTone's national counsel approached plaintiff and advised it that, in addition to the claims that Broan-NuTone had made already against plaintiff, Broan-NuTone had received notice of several additional claims, many of which involved plaintiff's motors. Broan NuTone's counsel suggested to plaintiff that unless a joint defense arrangement was reached between plaintiff and Broan-NuTone, Broan-NuTone would continue to join plaintiff in numerous additional lawsuits.

At this time, defendant had been relying solely on Gallagher Bassett and plaintiff, particularly Schneier, to coordinate the defense of the Broan-NuTone claims. Each claim was being handled separately, with no overall strategy in place and no central database of documents. Defendant had not evaluated whether cross-claims should be filed against Broan-NuTone or any third party suppliers and plaintiff and Broan-NuTone had not entered into any joint defense agreements. Defendant had not retained any counsel in addition to local counsel to coordinate the defense.

### F. Hiring of Hires Foley & Lardner as National Counsel

In early 2008, Regal-Beloit's general counsel, Paul Jones, decided that plaintiff and

8

Schneier in particular would soon be overwhelmed by claims if plaintiff did not hire national coordinating counsel and enter into a joint defense agreement with Broan-NuTone. Plaintiff believed that national counsel could create an overall defense strategy, coordinate experts, discovery and settlement issues and insure that plaintiff took uniform positions in each case.

By email dated February 22, 2008, Schneier notified Mike Brian of Twin City Insurance that plaintiff wanted to retain the law firm of Foley & Lardner to act as national defense counsel. She requested Twin City's approval and asked how the defense costs would be handled. Brian agreed to Foley's retention as national counsel and insisted that steps be taken to prevent overlap of work between national and local counsel. He also asked that national counsel bill separately for each case for accounting purposes and stated that if work benefited Broan-NuTone, it should pay 50% of the fee. (Schneier says she remembers "preparing" a letter to Rebuck about retaining national counsel, but she has no record of the letter and does not recall whether she actually sent it. Defendant denies that Rebuck ever received a letter from Schneier asking to retain national counsel.)

Sometime in early 2008, plaintiff retained Foley to act as national counsel, with James Clark leading the coordinating counsel defense team. Clark had been practicing law with Foley for 41 years and had significant product liability experience. After plaintiff retained Foley, Schneier called Rebuck and told him that plaintiff had retained Foley as national coordinating counsel. During the conversation, Rebuck did not give any opinion about hiring national counsel and neither Rebuck nor Schneier raised the issue of Foley's compensation.

On May 28, 2008, Clark (from Foley), Rebuck, Schneier and Brian (from Twin City

9

Insurance) held a conference call to discuss Foley's role as national counsel in handling the Broan-NuTone claims.  During the call, Clark provided an overview of the pending claims, including the number and types of claims and details regarding the fan motors and electrical components of the fans.  Clark also explained that Foley would provide general oversight and would coordinate discovery responses, answers and other responsive pleadings.  (The parties dispute whether Clark made clear during the conference call that Foley would create and maintain a document database for plaintiff's documents and would have primary responsibility for evaluating settlements, as well as a lead role in retaining experts and conducting discovery.  Plaintiff says this was clear from the conference call, while defendant says that discussions regarding Foley's role were general and that Clark did not speak about particular tasks that Foley would undertake or how work would be split specifically between Foley and local defense counsel.)

Rebuck's participation during the conference call was minimal.  He mostly listened and did not say anything about Foley's role, with the exception of a few remarks about procedures Foley should take to be paid for attending depositions, meetings or mediation with local defense counsel.  In particular, the parties anticipated that there would be instances in which national counsel should participate in activities assigned ordinarily to local counsel, such as preparing experts for depositions, taking depositions of experts or participating in trial.  The parties agreed that in situations with a potential for overlapping fees, either national counsel or plaintiff would consult with the insurers and obtain their approval for national counsel's participation in that particular activity.  The topic of Foley's fees, rates, billing or who would pay for Foley's work as national counsel generally was not

10

raised or discussed during the conference call.

Shortly after the May 28 conference call, Foley took charge of the strategy and oversight of all Broan-NuTone claims involving plaintiff. Its initial work was to formulate an overall strategy for the defense of the cases by interviewing relevant witnesses about the design and construction of plaintiff's motors, retaining experts, evaluating the contracts between plaintiff and Broan-NuTone, addressing potential claims against Broan-NuTone and third-party suppliers, developing a general protocol for site inspections and addressing recurring legal issues common to the claims. Foley created and continues to maintain a document database that it uses to prepare answers, raise affirmative defenses, file and respond to discovery requests, prepare for depositions and otherwise assist local counsel in the handling of the defense.

Foley negotiated several joint defense agreements with Broan-NuTone under which plaintiff and Broan-NuTone agreed to share the costs of local counsel and forgo claims against each other. Foley would draft the joint defense agreements and forward them to Rebuck at Gallagher Bassett for approval. In cases in which a joint defense agreement was in place, either Broan-NuTone or plaintiff selected counsel, subject to defendant's approval. Foley sent detailed letters to local counsel and Rebuck, explaining the different roles of local and national counsel. It explained counsel's respective roles in expert depositions and site inspections and stated that Foley would coordinate discovery and responsive pleadings. In addition, it directed local counsel to report to Foley and Rebuck for claims being defended under defendant's policy on "any communication of significance to this case." It also instructed local not to undertake any legal research of significance or send any discovery

11

requests before consulting with Foley.

Foley took the lead role in communicating with experts about the electrical components of the motors and fans and in debriefing experts after inspections of the artifacts of particular fires.  Foley sent biweekly reports to plaintiff about the status of the various claims and reported to Rebuck about the claims falling under its policy and particularly, about inspections of the particular motors or investigations and expert findings.

On at least one occasion, plaintiff wanted Foley to assist local counsel in helping an expert prepare for a deposition and in taking a deposition.  Because preparing for and taking depositions was a role that had been left to local counsel in most cases, Schneier asked Rebuck to approve Foley's participation; Rebuck approved the participation and agreed to pay for the expenses of Foley's participation.

## G.  Foley's Fees

After Foley was retained by plaintiff as national counsel, it billed plaintiff on a monthly basis and plaintiff paid the bills as they became due.  Foley billed all of its defense work to one matter.  On March 30, 2009, more than one year after plaintiff retained Foley, plaintiff requested reimbursement from defendant and Twin City Insurance for Foley's invoices from February 2008 through November 30, 2008 in the amount of $498,836.32.  Plaintiff demanded that each insurer pay the full amount.  (Plaintiff never sought reimbursement of Foley's fees from Travelers.)  The March 30, 2009 bill was the first time that defendant or Gallagher Bassett were informed of Foley's hourly rates in writing.  (The rates were more than double those charged by defendant's approved Wisconsin counsel,

Whyte Hirschboeck Dudek.)

The insurers did not contact each other after receiving the bill.  Twin City reached an agreement with plaintiff regarding payment of fees, acknowledging that it had agreed previously to pay for services rendered by Foley, but requesting additional information so that it could properly attribute defense costs to specific claims.  In particular, Twin City requested that Foley review its invoices and itemize its activities on an individual case basis.

On May 4, 2009, David Matthiessen sent a letter to plaintiff, on behalf of defendant, stating that it would not pay for any costs of Foley as national counsel because it did not consent to paying for those fees, with the exception of Foley's attendance at a particular deposition.  Matthiesen cited the provision in its policy that "[n]o insured will, except at the insured's own cost, voluntarily make a payment, assume any obligation, or incur any expense, other than for first aid, without our consent."  Matthiessen concluded that defendant "has never consented to reimbursing Regal-Beloit for the expenses incurred by Foley & Lardner."

After receiving the letter, plaintiff continued to employ Foley as its national coordinating counsel, incurring additional fees and expenses.  Plaintiff did not ask Foley to alter its role as national counsel with respect to claims made under defendant's policy. Plaintiff did ask Foley to revise past invoices to break out its work for specific cases and general work and to do so going forward.  After Foley revised its bills, some work continued to be billed under a "general" category, representing work that applied to the defense of the cases.

On June 30, 2010, after Foley completed the process of breaking out the past

invoices, plaintiff forwarded to Twin City and defendant revised bills for work through November 2008 and new bills for December 2008 through April 30, 2010.  Plaintiff asked each insurer to pay the claim-specific fees and expenses for claims defended under their respective policies.  The total sum allocated to defendant through January 31, 2011 was $410,337.54 for specific claims and $816,926.51 for general defense costs.  With regard to the general, non-claim-specific fees and costs, plaintiff reiterated its position that each insurer was independently responsible for all of those costs, but stated that it would accept half of such expenses from each insurer.

Twin City agreed to reimburse plaintiff for all claim-specific costs for claims under its policy and for half of the general defense costs.  Defendant refused to pay any Foley costs, with the exception of the fees it had expressly agreed to pay related to Foley's involvement in preparing an expert for his deposition and for attending an expert deposition.  By letter dated July 26, 2010, defendant stated that its position on payment of defense costs remained unchanged from its earlier letter of May 4, 2009.

From February 2008 through December 31, 2011, plaintiff has paid claim-specific defense costs to Foley that are attributable to claims made under defendant's policy in the amount of $535,649.60 and has paid $923,993.96 in general defense costs.  Of that amount, Twin City has either paid or agreed to pay one-half, or $461,996.98, leaving plaintiff with $461,996.98 in unreimbursed general costs.

OPINION

A.  Choice of Law

The initial issue is what law applies to plaintiff's claims.  Defendant contends that Wisconsin law applies to plaintiff's claims; plaintiff argues that Missouri law should apply. Although Missouri and Wisconsin law are similar, Missouri law requires an insurer to prove prejudice before it can avoid payment under a voluntary payment provision of an insurance contract, Kearns v. Interlex Ins. Co., 231 S.W.3d 325, 331 (Mo. Ct. App. 2007), while Wisconsin law grants a presumption of prejudice to an insurer, Phoenix Contractors, Inc. v. Affiliated Capital Corp., 2004 WI App 103, ¶ 11, 273 Wis. 2d 736, 681 N.W.2d 310. Because subject matter jurisdiction in this case is based on diversity, the court applies Wisconsin choice of law rules to determine the law applicable to the insurance contract. Jupiter Aluminum Corp. v. Home Insurance Co., 225 F.3d 868, 873 (7th Cir. 2000).  Under Wisconsin's "grouping of contracts" approach, the court is to apply the law of the jurisdiction with which the contract has its most significant relationship.  In re Jafari, 569 F.3d 644, 649 (7th Cir. 2009) (citing State Farm Mutual Automobile Insurance Co. v. Gillette, 2002 WI 31, ¶ 26, 251 Wis. 2d 561, 641 N.W.2d 662).  Under this approach, Missouri law governs because Missouri has the most significant contacts with the insurance contract.  The policy was issued to plaintiff at a time when plaintiff's principal place of business was in Missouri and it contains Missouri-specific endorsements.  Additionally, Missouri was the state in which the policyholder's insured activity, the manufacture and distribution of electric motors that were incorporated into Broan-NuTone fans, took place. Although defendant contends that Wisconsin law should apply, it does not undertake a

15

choice of law analysis or explain why Wisconsin law should apply when the only Wisconsin connection to the insurance policy is that plaintiff was purchased by a Wisconsin corporation near the end of the policy term.   Therefore, I will apply Missouri law to plaintiff's claims.


B.  Duty to Defend

The question at issue is whether defendant breached its duty to defend by failing to retain national coordinating counsel with the ability to coordinate defense of the Broan-NuTone cases and by failing to pay the defense costs incurred by Foley after plaintiff hired Foley as national counsel.  Plaintiff contends that because defendant was aware of and benefited from Foley's work, and the work would otherwise have been performed by local counsel or plaintiff, Foley's fees are defense costs that defendant is required to pay.  In response, defendant contends that it did not breach the insurance contract; rather, it fulfilled its duty to defend plaintiff by hiring local counsel to defend plaintiff.  Defendant denies that the policy obligates it to pay for defense counsel selected by plaintiff, particularly when defendant never agreed to pay for Foley's fees as national coordinating counsel.

Resolution of the parties' dispute depends on the scope of defendant's duty to defend plaintiff.  Defendant's duty arises out of the insurance contract and that contract defines the scope of its duty.  Fireman's Fund Insurance Co. v. TIG Insurance Co., 14 S.W.3d 230, 232 (Mo. Ct. App. 2000); Crown Center Redevelopment Corp. v. Occidental Fire & Casualty Co., 716 S.W.2d 348, 357 (Mo. Ct. App. 1986).  The contract provides that defendant has the "right and duty to defend the insured against any 'suit' seeking" bodily injury or property

16

damages to which the insurance applied." Dkt. #12-2 at 1. Also, defendant must pay "[a]ll expenses [it] incur[s]" and "[a]ll reasonable expenses incurred by the insured at [defendant's] request to assist us in the investigation or defense of the claim or 'suit.'" Id. at 7-8.

This provision is similar to many standard defense provision in insurance policies. As the Missouri Supreme Court and other courts have explained, such standard defense provisions contractually obligate the insurer to hire and pay for counsel that will provide a competent defense for the insured. Landie v. Century Indemnity Co., 390 S.W.2d 558, 562 (Mo. Ct. App. 1965); See also Watts Water Technologies, Inc. v. Fireman's Fund Insurance Co., 2007 WL 2083769, *6 (Mass. Super. July 11, 2007) (insurer fulfills duty to defend "by retaining counsel to represent" insured); Sierra Pacific Industries v. American States Insurance Co., 2011 WL 2935878, *3, 6 (E.D. Cal. July 18, 2011) (duty to defend "requires that the insurer provide competent counsel, qualified to defend the insured in the particular matter at issue" and "adequate funds" to conduct "meaningful defense").

Additionally, like many standard defense provisions, the policy states that defendant has the "right" to defend suits against plaintiff and the discretion to "investigate any 'occurrence' and settle any claim or 'suit that may result." Under Missouri law, this language gives the insurer the right to control the defense it provides to its insured, at least under most circumstances. McCormack Baron Management Services, Inc. v. American Guarantee & Liability Insurance Co., 989 S.W.2d 168, n.2 (Mo. 1999) ("We note that an insurer's obligation to defend is also a *right* to defend. Depending upon the language of the policy, once an insurer recognizes its right and duty to defend, it usually is afforded control over the litigation to protect its financial interests.") (emphasis added); Versaw v. Versaw, 202

17

S.W.3d 638, 651 (Mo. Ct. App. 2006); Truck Insurance Exchange v. Prairie Framing, LLC, 162 S.W.3d 64, 88 (Mo. Ct. App. 2005).  As the Missouri Supreme Court explained in In re Allstate Insurance Co., 722 S.W.2d 947, 952 (Mo. 1987):

> The insurer has the contract right to direct the litigation against its insured. It may evaluate claims and decide whether to settle or try.  It may make economic decisions without the assent of the insured.  The insured may want a quick settlement to eliminate further demands on time and energy, but the insurer does not have to settle unless a satisfactory offer is forthcoming.  Or the insurer may accept a settlement offer even though the insured wants to go to trial to establish freedom from fault.  The insurer may decide what to spend in defense, what discovery is to be had, and what experts to hire.  It also has the right to select counsel to defend its interests.

The insurer's right to control the defense has limited exceptions.  For example, if the insurer agrees to defend only with a reservation of rights, it forfeits its right to control the litigation.  Fostill Lake Builders, LLC v. Tudor Insurance Co., 338 S.W.3d 336, 344 (Mo. Ct. App. 2011); Borgard v. Integrated National Life Insurance Co., 954 S.W.2d 532, 535 (Mo. Ct. App. 1997).  Additionally, the insurer may lose the right to control litigation if a conflict of interest exists between the insurance company and the insured.  National Casualty Co. v. Forge Industrial Staffing Inc., 567 F.3d 871, 874 (7th Cir. 2009); Allstate Insurance Co. v. Aetna Casualty & Surety, 595 N.Y.S.2d 552, 667 (N.Y. App. Div. 1993). Finally, if an insurer breaches its duty to defend, the insurer forfeits its right to control defense of the action.  Landie, 390 S.W.2d at 562.  See also Sierra Pacific, 2011 WL 2935878, *3 ("[W]hen an insurer breaches its duty to defend, the insurer forfeits the right to control defense of the action.").

If the insurer agrees to defend only with a reservation of rights, if there is a conflict of interest or if the insurer breaches its duty to defend, the insured gains the right to hire its

18

own counsel to provide a defense.  In such situations, the insurer must pay the reasonable fees of plaintiff's chosen counsel and any other expenses incurred by the insured in conducting the defense or negotiating a settlement of the suit.  Landie, 390 S.W.2d at 562. In addition, the insured is released from policy prohibitions against incurring expenses and negotiating and settling claims.  Id.  See also Stark Liquidation Co. v. Florists' Mutual Insurance Co., 243 S.W.3d 385, 399 (Mo. Ct. App. 2007).

Defendant contends that none of the exceptions to the general rule allowing it control over the litigation applies to this case.  No conflict of interest existed between defendant and plaintiff and defendant agreed to defend without a reservation of rights.  Defendant hired and paid for competent local counsel to defend plaintiff.  Defendant cites Trinity Universal Insurance Co. v. Stevens Forestry Service, Inc., 335 F.3d 353, 355 (5th Cir. 2003), in which the court held that so long as the insurer provides competent and adequate counsel, the insurer fulfills its duty to defend and is not required to pay for additional counsel hired by the insured.  Defendant contends that it fulfilled its duty to defend and thus retained the exclusive right to control defense of claims against plaintiff in the Broan-NuTone cases, including the right to select defense counsel, determine overall strategy and decide whether national coordinating counsel was needed.

Plaintiff disagrees, contending that it was necessary to hire national counsel to coordinate the defense of the numerous Broan-NuTone claims and that until national counsel had been hired, defendant was not fulfilling its duty to defend.  Plaintiff cites Watts Water Technologies, 2007 WL 2083769, *8, in which the insurer contended that it had the duty to pay only one law firm to represent the insured and had no duty to pay the legal fees

of national counsel.  In <u>Watts</u>, the court noted the value and efficiency provided by national counsel and concluded that the insurer was required to pay for legal work performed by national counsel as part of its duty to defend.  Plaintiff also cites <u>Steadfast Insurance Co. v. Purdue Frederick Co.</u>, 2005 WL3511081, *3-4 (Conn. Super. Ct. Nov. 29, 2005), in which the court explained that whether an insurer must pay for national coordinating counsel may depend on whether national counsel was appropriate in light of the complexity and exposure of the underlying lawsuits.  <u>See also</u> <u>Bain v. Unitrin Auto and Home Insurance Co.</u>, 708 S.E.2d 410, 415 (N.C. Ct. App. 2011) ("The defense mounted should be in proportion to the claim.").  Plaintiff contends that the quantity, complexity and potential exposure of the Broan-NuTone lawsuits made national counsel a part of defendant's duty to defend.

Neither plaintiff's nor defendant's arguments are wholly compelling because neither party addresses the actual circumstances of this case.  The cases cited by plaintiff are not directly on point.  The insurance companies involved in both <u>Watts Water</u> and <u>Steadfast</u> had agreed to defend under a reservation of rights and thus, had ceded at least some of their right to control the litigation.  The disputes concerned whether the insurance company had to pay for the counsel chosen by the insured without input from the insurance company.

In this case, defendant agreed to defend without a reservation of rights and thus retained the right to control the litigation.  However, the evidence in this case shows that defendant exercised its control of the litigation by delegating that control to others.  It hired Gallagher Bassett to administer the claims.  Michael Rebuck, who was employed by Gallagher Bassett and assigned the Broan-NuTone cases, had no experience coordinating multiple claims arising out of the same alleged product defect.  As a result, much of the

20

responsibility for overseeing the Broan-NuTone claims fell to Charldene Schneier, a lawyer in Regal-Beloit's legal department.  Schneier made many of the initial decisions regarding which firm to hire as local counsel, often retaining counsel and then gaining approval from defendant later.  Schneier also performed many other tasks related to the claims, including working with engineers to set up and prepare for inspections, gathering evidence, recommending experts, drafting answers to discovery responses and providing local counsel information needed to respond to discovery requests.  When Schneier's workload grew too large for her to handle, plaintiff decided to hire Foley as national coordinating counsel.  After Foley was retained, it assumed a major role in plaintiff's defense by formulating on overall strategy for the defense of the cases, interviewing witnesses, retaining and communicating with experts, evaluating and negotiating contracts and joint defense agreements, creating and maintaining a document database, drafting responsive pleadings, coordinating discovery and providing guidance to local counsel.

Thus, this is not a typical case about an insurer's "right to control" litigation, such as a situation in which the insurer disagreed with a strategic decision or settlement proposed by its insured or rejected the concept of national counsel or a particular firm chosen by its insured.  In this case, plaintiff talked to defendant about hiring Foley as national counsel and included defendant in discussions about the scope of Foley's role.  After Foley was hired and assumed a major role in the defense, defendant never objected to Foley's role and never indicated that Foley or plaintiff was encroaching on its right to control the litigation.  Instead, defendant seemed content to let plaintiff and Foley handle much of the core defense work.  For example, although defendant retained ultimate control over the selection of local

counsel and experts, the decision whether to enter into joint defense agreements with Broan-NuTone and the terms of settlements, defendant allowed Foley to delineate the duties between local and national counsel, negotiate terms of the joint defense agreements, evaluate potential settlements and debrief defendant regarding experts. Additionally, defendant allowed Foley to undertake several tasks that were central to defending claims and otherwise would have been performed by local counsel, including preparing answers, filing motions, filing and responding to discovery requests, working with expert witnesses, preparing for trial and attending depositions in certain cases.

I conclude that under these circumstances, defendant is responsible for the fees incurred by Foley as national counsel. It is undisputed that defendant knew Foley was performing necessary defense work that local counsel would have performed and that defendant did nothing to prevent Foley from taking this role or to otherwise assert its own right to take control of the litigation. Until defendant received a bill for Foley's fees, defendant made no complaint about the vast amount of work that Foley was performing in plaintiff's defense.

Additionally, I am not persuaded by defendant's argument that the "voluntary payment" provision of the insurance contract takes Foley's fees outside the defense costs for which defendant is liable. That provision states that "[n]o insured will, except at the insured's own cost, voluntarily make a payment, assume an obligation or incur any expense, other than for first aid, without our consent." Dkt. #12-2, at 10. Defendant contends that even if national counsel was necessary and even if defendant would have had to pay local counsel to do the same work performed by Foley, it is not obligated to pay Foley's fees

because plaintiff had not obtained defendant's express consent to hire Foley before the work was performed.

Defendant has cited no cases in which the voluntary payment provision was applied to relieve an insurer from paying defense costs in a situation similar to this one. That is because breaches of the voluntary payment provisions typically occur before an insured has tendered a claim to its insurer. The California Court of Appeals explained this in <u>Truck Insurance Exchange v. Unigard Insurance Co.</u>, 94 Cal. Rptr. 2d 516 (Cal. Ct. App. 2000), a case on which defendant relies heavily in its brief. The court stated that voluntary payment provisions are in place to make clear that "[t]he duty to defend arises when the insured tenders defense of the third party lawsuit to the insurer." <u>Id.</u> at 976. Once the duty to defend attaches, the insurer gains the right to control and direct the defense. Thus, if an insured incurs defense costs or makes voluntary payments before tendering the claim to the insured, the insured is deprived of its right to control the litigation. <u>Id.</u> In those situations, the insurer has not had an opportunity to object to consent to the costs incurred by the insured. In contrast, the costs defendant seeks to avoid in this case were incurred after plaintiff tendered claims to defendant, when defendant had notice of the litigation and a full opportunity to control it. It could have objected to the hiring of national counsel, but it did not. I conclude, therefore, that plaintiff did not deprive defendant of its right to control the litigation by hiring Foley.

Moreover, even if the voluntary payment provision was applicable in this case, plaintiff did not incur fees without defendant's consent. The voluntary payments provision in the policy is silent on the form or timing of "consent" that defendant must give. Nothing

in the insurance policy requires that defendant's consent must be written or express.  In fact, the parties in this case operated under an informal process.  It was not uncommon for plaintiff to make the first contact with local counsel or unilaterally retain experts and ask for defendant's approval later.

In the case of Foley, plaintiff never received defendant's express consent to retain Foley, never raised the issue of Foley's hourly rates and never verified with Rebuck whether defendant was willing to pay for Foley's fees.  Plaintiff could have avoided this lawsuit if it had communicated with defendant its understanding of who would be paying for Foley's fees.  However, the evidence supports plaintiff's argument that defendant gave implied consent to Foley's participation and implied that it would reimburse plaintiff for Foley's fees.

As the insurer, defendant had the duty to clarify any ambiguity or misunderstandings between the parties.  Freeman v. Leader National Insurance Co., 58 S.W.3d 590, 598 (Mo. Ct. App. 2001) ("An insurer's right to control settlement and litigation under a liability insurance policy creates a fiduciary relationship between insurer and insured."); Towne Realty, Inc. v. Zurich Insurance Co., 201 Wis. 2d 260, 269, 548 N.W.2d 64, 67 (1996) ("burden of ensuring clear communication between the insurer and insured [is] on the insurer, who is better positioned, in terms of expertise and resources, to manage such a task") (citation omitted).  Instead, defendant acted in ways that suggested it had agreed to pay for Foley's role as national counsel.

For example, defendant participated in a lengthy discussion about what roles would be played by Foley and local counsel, received letters drafted by Foley summarizing the roles of Foley and local counsel, required special approval when Foley would act outside of its role

24

as national counsel and potentially "double up" on the work being performed by local counsel, worked with Foley in debriefing experts and until it received plaintiff's request for reimbursement of Foley's fees, never objected to Foley's retention or payment of its fees. From these actions, it was reasonable for plaintiff to believe that defendant had consented to the retention of Foley to payment of its fees for acting as national counsel.  I am not persuaded by defendant's argument that it agreed to Foley's participation only because it thought plaintiff had hired Foley to assume plaintiff's own responsibilities in defending the cases and to protect any uninsured interests of plaintiff.  The evidence shows that Foley was providing core defense work that local counsel otherwise would have provided, not simply work that plaintiff was required to perform to fulfill its duty of cooperation under the insurance policy.

Although I have found no Missouri cases addressing a similar factual scenario, several cases from other jurisdictions provide guidance on this issue and suggest that defendant cannot avoid liability by invoking the voluntary payments provision.  For example, in Landmark American Insurance Co. v. Ray, 2006 WL 4092436 (W.D. Tex. Dec. 21, 2006), the insurer hired counsel to defend its insured in a lawsuit against her.  However, the insured hired additional counsel that assumed the primary role in her defense. The counsel hired by the insurer "did not provide a defense to [the insured] in any substantive way."  Id. at *8 (noting that counsel "did not actively undertake the defense . . .[h]e filed no motions . . . asked no questions at witness depositions and took no part in the various discovery disputes").  The court held that the insurer was required to pay for the insured's additional counsel, concluding that the insurer "did not . . . carry out its duty [to defend] in a manner

25

consistent with its argument against being responsible for any of [the insured's] attorneys' fees." Rather, the insurer had "allow[ed] [the insured's] legal team to shoulder the burden of the litigation, without objection or seeking to clarify the attorneys' respective roles." Id. at *8. Thus, the insurer's "course of dealing result[ed] in a waiver of the argument that the 'voluntary payment provision' of the Policy prevented [the insured] from incurring any legal costs to which [the insurer] did not consent." Id.

Similarly, in Scottsdale Insurance Co. v. Homestead Land Development Corp., 145 F.R.D. 523 (N.D. Cal. 1992), the insurer contended that it did not have to pay for the costs of a law firm retained by the insured because the insurer had provided a different law firm that adequately represented the insured. The court rejected the insurer's argument, concluding that the insurer was liable under its policy for the fees of the second law firm. Although there was no evidence that the insurer "expressly approved" hiring the law firm, as "formally required by the insurance contract . . . [i]t [wa]s quite clear . . . that [the insurer] had prompt actual notice that [the insured] had engaged [the law firm] to serve in the role from which [another firm] was compelled to withdraw." Id. at 539. The insurance company knew full well that the new law firm was acting in that capacity and did not object, did not communicate that it would refuse to pay fees generated by the new law firm and "took no steps . . . to assure that the [its] firm rather than [the new firm hired by the insured] played the lead role in litigating and settling" the claim. Id. Rather, the law firm hired by the insurance company "remained relatively passive," while the firm hired by the insured "did virtually all of the front line work" and "performed work that [the other law firm] otherwise would have been compelled to perform." Id. Under these circumstances,

26

"it was reasonable for both [the insured] and [the new firm] to infer that [the insurer] tacitly approved of the representation. . . ."  The insurer "clearly could have taken steps to protect any interests of its that it might have perceived as being compromised.  Because [the insurer] failed to take any such steps, it [was] estopped from complaining now."  Id.

Finally, in Richardson Electronics, Ltd. v. Federal Insurance Co., 120 F. Supp. 2d 698 (N.D. Ill. 2000), the insurer argued that it was not liable for defense fees because it had never specifically consented to a particular law firm's representation of its insured.  Id. at 702.  The court held that because the policy term "consented" was ambiguous, the contract allowed for implied consent and that because the insurance company had been notified of the representation "and fail[ed] to object," it "tacitly consented to any representation."  Id.

The reasoning in these cases is persuasive.  Although defendant agreed to defend plaintiff in the Broan-NuTone cases without reservation of rights, it allowed Foley to take a primary role in the defense of the cases without objection and made no attempt to clarify the respective roles between local counsel and Foley.  This resulted in Foley's performing many tasks that were necessary to the defense of the cases and that defendant would have paid local counsel to perform.  Through its actions, defendant consented implicitly to the retention of Foley.  It cannot now invoke the voluntary payments provision to avoid its obligation to pay Foley's fees.

Defendant makes a final argument regarding its duty to pay Foley's fees, contending that even if it is obligated to pay some of the fees, it should not be required to pay any fees incurred after May 4, 2009, when it notified plaintiff that it would not pay for costs of Foley as national counsel.  It is true that in his May 4 letter, David Matthiessen cited only the

27

voluntary payment provision, denying payment on the grounds that defendant never consented to reimbursing the costs of national counsel.  However, as I have just explained, defendant's actions before this date amount to implied consent.  Moreover, by this time, Foley had been acting as national counsel for more than a year and many cases were ongoing.  Matthiessen did not suggest that defendant was now invoking its right to control the defense more closely and intended to rein in Foley's work and he did not provide any suggestion about how the defense could be provided without Foley.  Presumably, with Foley so engaged in the cases, it would have been difficult for plaintiff or defendant to terminate Foley's services at that point.  Thus, even after sending the May 4 letter, defendant continued to allow Foley to operate as national counsel and provide core defense work in the Broan-NuTone cases.

Therefore, I conclude that defendant's duty to defend obligates it to compensate plaintiff for the fees incurred by Foley as national counsel in defending claims falling under defendant's policy.  This includes the $535,649.60 plaintiff has paid to Foley for claim-specific defense attributable to claims made under defendant's policy and $461,996.98 in general defense costs, for a total of $997,646.58 in costs through December 31, 2011, plus interest under the 9% rate prescribed in Mo. Rev. Stat. § 408.020.

## C.  Bad Faith

Plaintiff has also asserted a tort claim of bad faith against defendant, contending that defendant had no reasonable basis for refusing to reimburse plaintiff for Foley's fees. However, as defendant points out, under Missouri law a breach of the duty to defend sounds

in contract, not in tort.  Quick v. National Auto Credit, 65 F.3d 741, 744 (8th Cir. 1995) ("In Missouri, a breach of the duty to defend sounds in contract, while a breach of the duty to settle sounds in tort."); Overcast v. Billings Mutual Insurance Co., 11 S.W.3d 62, 67 (Mo. 2000) ("insurance contract is the basis for the relationship between the insurer and its insured," while liability for handling third party claims in "bad faith" "is premised on tort concepts").  Therefore, defendant is entitled to summary judgment on plaintiff's bad faith claim.

## ORDER

IT IS ORDERED that

1.  Plaintiff Jakel Motors Incorporated's motion for summary judgment on its beach of contract claim against defendant American Alternative Insurance Corporation, dkt. #13, is GRANTED.  Defendant must reimburse plaintiff in the amount of $997,646.58 for the fees incurred by the law firm of Foley & Lardner in its role as national counsel for plaintiff, plus statutory interest at the rate of 9%.

2.  Defendant's motion for summary judgment, dkt. #11, is GRANTED IN PART and DENIED IN PART.  The motion is GRANTED with respect to plaintiff's bad faith claim against defendant.  The motion is DENIED in all other respects.

3.  The clerk of court is directed to enter judgment accordingly and close this case.

Entered this 4th day of June, 2012.

                                   BY THE COURT:
                                   /s/
                                   BARBARA B. CRABB
                                   District Judge